Jesse Mondry, OSB #192559
Harris Bricken Sliwoski, LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
Jesse@harrisbricken.com

Tara J. Plochocki, DC Bar 989404
Lewis Baach Kaufmann Middlemiss pllc
1101 New York Avenue NW
Suite 1000
Washington DC  20005
Tel. 202-659-7217
tara.plochocki@lbkmlaw.com

*Counsel for Petitioner Novalpina Capital Partners I GP S.À.R.L.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **IN RE PETITION OF NOVALPINA CAPITAL PARTNERS I GP S.À.R.L. FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** | Case No.  3:23-mc-82 IM<br><br>**MEMORANDUM OF LAW IN SUPPORT OF EX PARTE PETITION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** |

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................. 1

   A.   The Fund and Related Persons and Entities ............................................................ 2

   B.   Takeover Attempt by Stephen Peel ......................................................................... 4

   C.   The LPAC Backs Peel's Pitch to Remove Novalpina GP ...................................... 6

   D.   Installing Peel Managers to Approve the Replacement of the General Partner ................. 8

   E.   Ongoing Abuse of Power – Laboratoire XO Sale ................................................ 12

   F.   Ongoing Litigation by Novalpina GP in the Luxembourg Courts ....................... 13

   G.   Legal Proceedings for Which Evidence is Sought ............................................... 14

       1.   Defense Against New Lawsuit .................................................................. 14

       2.   Evidence in support of contemplated civil fraud claim ............................ 15

   H.   Respondents and Discovery Sought ..................................................................... 16

LEGAL ARGUMENT ...................................................................................................... 17

   A.   The Petition Meets All Three Statutory Requirements of 28 U.S.C. § 1782 ..................... 18

       1.   Mssrs. Read and Langdon Reside or are Found in Oregon. ...................... 18

       2.   Petitioner's requested discovery is for use in a pending and an anticipated foreign proceeding in Luxembourg. ......................................... 18

       3.   Petitioner is an "interested person," since Petitioner is a defendant in one and will be a plaintiff in another Luxembourgian action. ...................... 20

   B.   The Court Should Grant this Petition in Its Discretion ........................................ 21

       1.   The discovery sought is beyond the reach of the Luxembourg courts. ...................... 21

       2.   There is no evidence that Luxembourgish Courts in the pending and contemplated lawsuits would reject discovery obtained through the Petition. ............ 23

       3.   The Petition does not circumvent Luxembourg's laws of evidence. .......................... 24

       4.   The requests relate to discrete and recent actions over a short time period. .............. 25

CONCLUSION ................................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
 673 F.3d 76 (2d Cir. 2012)................................................................................18

*Euromepa S.A. v. R. Esmerian, Inc.*,
 51 F.3d 1095 (2d Cir. 1995)............................................................................24

*In re Ambercroft Trading Ltd.*,
 No. 18-MC-80074-KAW, 2018 WL 2867744 (N.D. Cal. June 11, 2018) ..........................23, 24

*In re Auto-Guadeloupe Investissement S.A.*,
 No. 12 MC 221 RPP, 2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012)................................22, 25

*In re Blue Skye Fin. Partners S.A.R.L.*,
 No. 22 MISC. 171 (KPF), 2022 WL 2441074 (S.D.N.Y. July 5, 2022) ...................................24

*In re Borrelli*,
 No. 20-MC-80154-JSC, 2020 WL 5642484 (N.D. Cal. Sept. 22, 2020)...................................21

*In re Furstenberg Fin. SAS*,
 785 F. App'x 882 (2d Cir. 2019) .........................................................................20

*In re Furstenberg Fin. SAS*,
 334 F. Supp. 3d 616 (S.D.N.Y. 2018)....................................................................24

*In re Hornbeam Corp.*,
 722 F. App'x 7 (2d Cir. 2018) ...........................................................................26

*In re Joint Stock Co. Raiffeinsenbank*,
 No. 16-MC-80203-MEJ, 2016 WL 6474224 (N.D. Cal. Nov. 2, 2016)........................21, 23, 25

*In re Letter of Request from Loc. Ct. in Kusel, Germany*,
 No. 1:22-CV-01009-CL, 2022 WL 5142753 (D. Or. Oct. 5, 2022) ..............................17, 21, 23

*In re Nouvel, LLC*,
 No. 22-MC-0004-MCS(EX), 2022 WL 3012521 (C.D. Cal. June 8, 2022)............19, 22, 24, 25

*In re Porsche Automobil Holding SE*,
 No. 15-MC-417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ..........................21, 22, 25

*In re Republic of Ecuador*,
 No. C-10-80225, 2010 WL 3702427 (N.D. Cal. Sept. 15, 2010)..............................................18

*In re Vahabzadeh*,
   No. 20-MC-80116-DMR, 2020 WL 5095131 (N.D. Cal. Aug. 28, 2020) .........................22, 23


*In re Will Co. Ltd.*,
   No. 21-MC-80211-JCS, 2021 WL 5322653 (N.D. Cal. Nov. 16, 2021) ............................ 19-20

*In re Willway Co., Ltd.*,
   No. 22-MC-80310-BLF, 2022 WL 17331258 (N.D. Cal. Nov. 29, 2022) ...............................20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ............................................................................................... *passim*

*Khrapunov v. Prosyankin*,
   931 F.3d 922 (9th Cir. 2019) ...........................................................................................17, 18

*London v. Does 1-4*,
   279 F. App'x 513 (9th Cir. 2008) ..........................................................................................21

*Lufthansa Technik v. Panasonic Avionics Corp.*,
   No. C17-1453-JCC, 2017 WL 6311356 (W.D. Wash. Dec. 11, 2017) .....................................22

*Matter of Lufthansa Technick AG*,
   No. C17-1453-JCC, 2019 WL 331839 (W.D. Wash. Jan. 25, 2019) ............................22, 23, 24

*Siemens AG v. W. Digital Corp.*,
   No. 8:13-CV-01407-CAS, 2013 WL 5947973 (C.D. Cal. Nov. 4, 2013)) ...............................24

## REPORTS

S. Rep. No. 1580, 88th Cong., 2d Sess. (1964) ...........................................................................19

## STATUTORY AUTHORITIES

28 U.S.C. § 1782............................................................................................................ *passim*

Petitioner NOVALPINA CAPITAL PARTNERS I GP S.À.R.L. ("Novalpina GP") hereby petitions for an order of judicial assistance, pursuant to 28 U.S.C. § 1782, appointing Tara J. Plochocki, Esq. as a Commissioner of the Court to facilitate subpoenas for the gathering of documentary evidence from Tobias Reed, State Treasurer of the State of Oregon, and documentary and testamentary evidence from Michael Langdon, Director of Private Markets of the Oregon State Treasury Investment Division of the State of Oregon.  Each of the Respondents "resides in" or is "found in" Oregon within the meaning of § 1782.

Petitioner aims to obtain limited, but critical, discovery to 1) aid its defense in an action pending in the Commercial Chambers of the Luxembourg District Court; and 2) support a civil fraud claim, also to be filed in the Luxembourg District Court.

## FACTUAL BACKGROUND

This Petition concerns NOAL SCSp, originally known as Novalpina Capital Partners I SCSp (the "Fund"), a private equity fund once meticulously governed by Petitioner.  In August 2021, opportunistic investment managers and a limited partner conspired to co-opt the Fund, effecting Petitioner's removal based on false promises and concealed alliances.  The lead conspirator was Michael Langdon, the Director of Private Markets for the Oregon State Treasury Investment Division, where he recommends investments in private equity to be made on behalf of the Oregon Public Employees Retirement Fund ("OPERF").  Declaration of Nicolas Thieltgen ¶ 4.  With a €200 million investment made at the behest of Langdon himself, OPERF was the largest investor in the Fund; Langdon wielded power as the Chairman of the Limited Partner Advisory Committee ("LPAC").  *Id.* ¶ 5.  Desiring to boot Novalpina GP from the Fund "without cause," but not to pay millions of euros for the privilege of doing so, Langdon solicited the help of an asset management company that was willing to dispense with both the letter and the spirit

of the law to gain control.  That asset management company was the Luxembourgish entity BRG NOAL GP S.à.r.l. ("NOAL GP").  *Id.* ¶ 6.

Langdon and NOAL GP abused their powers through deceit and malice, which under Luxembourg law, constitutes fraud.  Their ruse is not going to last forever.  Indeed, Novalpina GP has been partially repaired via court orders dissembling the unlawful acts of co-opted Luxembourg directors that supported Langdon's coup.  *See id.* ¶¶ 7-8.  However, NOAL GP is not content to exclusively play defense, and with endless financial resources at its disposal, it doesn't have to.  NOAL GP recently filed a lawsuit in Luxembourg, claiming—without apparent irony—that *Petitioner* has fraudulently interfered with NOAL GP's control of the Fund.  Id. ¶ 9, Ex. 1.  This Petition seeks to enable Petitioner to expose who the real fraud is, both in its defense against NOAL GP and in a separate civil fraud lawsuit to be filed in Luxembourg with support from the evidence obtained in this action.

## A.  The Fund and Related Persons and Entities

Petitioner Novalpina GP is the former general partner of the private equity fund known as Novalpina Capital Partners I SCSp (the "Fund"), established in 2017.  The Fund was managed by Petitioner, with assistance from the Fund's independent Alternative Investment Fund Manager ("AIFM"), LIS Sanne S.A.  The three founders of the Fund—Stefan Kowski, Bastian Lueken, and Stephen Peel managed Novalpina Capital LLP and Novalpina Capital Management International LLP ("Investment Advisors") which issued investment recommendations to the Fund's AIFM. The Founders held and continue to hold significant economic interests in the Fund through a series of entities organized under Luxembourgish law.  The Founders each hold one-third of Novalpina Capital Group S.à.r.l. ("Topco"), the ultimate parent corporation of the Petitioner and the rest of the Novalpina entities.  *Id.* ¶ 10.

Each of the Novalpina entities were nestled in a complicated corporate structure.  A wholly owned subsidiary of Topco—Novalpina Capital Partners I Group GP S.à.r.l. ("Group GP")—was one of three initial Limited Partners of the Fund and provided part of the Sponsor Commitment.  It also owns Novalpina GP.  Group GP was the general partner of the second limited partner—Novalpina Capital Partners I FP SCSp (the "Carried Interest Partner"), which also provided part of the Sponsor Commitment.  The third and final Sponsor Commitment limited partner was Mr. Peel's family trust.  Together, the three Sponsor Commitment limited partners committed a total of EUR 78.862 million to the Fund.  *Id.* ¶ 11.

The Fund has an intricate structure as well.  The Fund's equity in its portfolio companies is held in four companies, but the most significant assets are held by NVP 103 S.à.r.l., within a subsidiary holding company formerly called Novalpina Capital Partners I Luxco S.à.r.l. ("Master Luxco").  Novalpina GP remains a shareholder of Master Luxco.  *Id.* ¶ 12.  The Fund added more than 70 additional Limited Partners over time, although the initial three Sponsor Commitment limited partners together comprised the second-largest investment bloc.  To the benefit of all investors, the Fund's performance exceeded expectations.  The Fund had invested in and then consolidated one of Europe's largest licensed casino and gambling enterprises, a leading French specialty pharmaceutical company, and, with the strong support of Michael Langdon, the NSO Group, maker of the controversial software Pegasus.  *Id.* ¶¶ 13-14.  These investments yielded a considerable profit, with many millions available to distribute upon a future realization.  Group GP and the Carried Interest Partner stood to gain considerable earnings; the latter also had an approximately 17% stake in the Fund's profits.  The ultimate beneficial owners of these earnings were the Founders, who each owned a third of TopCo and

were therefore entitled to split the profits and distributions, if the Novalpina limited partners chose to distribute any.  *Id.* ¶ 15.

Michael Langdon played a uniquely active role within the Fund and even within Novalpina GP, despite a clear prohibition on limited partners interfering with its management under the terms of the Limited Partnership Agreement.  Langdon came to the Oregon State Treasury after Hermes GPE shut down the Boston office he ran from 2013 to 2015, apparently in favor of bringing in new leadership to establish a New York office.  *Id.* ¶¶ 16–17.  Langdon was more familiar with NSO Group than most; he had already invested OPERF in Francisco Partners (*id*. ¶ 14), the private equity firm that sold Novalpina the majority stake in NSO Group.  It has been reported that Langdon was familiar with the bad publicity around the company relating to improper use of the Pegasus spyware technology.  *Id.*  He nevertheless gave the acquisition his "strong support" when it was raised by the Founders in a meeting in London on 15 June 2018.  Langdon was not supposed to be involved in the selection of portfolio companies.  According to the Oregon Treasury, "our role as a limited partner means…we do not participate in the selection, operation, or control of the portfolio companies."  *Id*.  Thus, it appears to have come as something of a surprise when The Guardian reported that Langdon had, in fact, voiced support for the acquisition of a company later blacklisted by the United States and Oregon itself.  *See id*.

### B.  Takeover Attempt by Stephen Peel

Mr. Peel wanted more than his one third of the Founder's economics.  In or around November 2020, he devised a plan with the support of certain Limited Partners in the Fund to increase his takings by removing the other two Founders.  When he launched his takeover effort, he had the right relationships; he handled most investor relations and frequently met with the limited partners.  Mr. Kowski and Mr. Lueken, conversely, focused their efforts on the

Investment Advisors services in relation to the Fund's investment strategy in its portfolio companies. *Id*. ¶ 18.

Mr. Peel first attempted to divide and conquer. He solicited Mr. Kowski's help in persuading the Limited Partners to push out Mr. Lueken. Mr. Peel's plan was to hold the Investment Advisors and TopCo hostage by refusing to approve any actions; both entities required unanimous approval of the Founders on all investment recommendations and resolutions. Mr. Kowski refused and instead aligned with Mr. Lueken; each committed to upholding their fiduciary duties to the Novalpina entities. *Id*. ¶ 19.

Mr. Peel was undeterred. In December 2020, Mr. Peel started blocking important investment and governance decisions within the Investment Advisers, making it difficult for them to fulfill their duties. *Id*. ¶ 20. He also obstructed management of the Novalpina entities overseen by the three Founders, including the holding company TopCo, which was a critical link in the chain of their shared economic interests. *Id*. Unbeknownst to Mssrs. Kowski and Lueken, Mr. Peel was not acting alone. In December 2020, he contacted Michael Langdon, the acting Limited Partner for OPERF, soliciting his backing. The two kept their conversation confidential from the other Founders and the other members of the LPAC, both breaching their duties. *Id*. ¶ 21.

For their part, Mssrs. Kowski and Lueken did damage control. They notified TopCo's other four managers of Mr. Peel's obstruction, and on January 10, 2021, the managers unanimously authorized the partial suspension of Mr. Peel's voting rights in TopCo so that the Novalpina entities could continue to function. *Id*. ¶ 22. In litigation over the corporate resolution suspending Mr. Peel's voting rights, it became clear that he had already made an agreement with Michael Langdon. When Mr. Peel filed an ex parte challenge to the suspension

of his voting rights in February 2021, he indicated to the Luxembourg court that if the dispute was not resolved, the LPAC would replace Novalpina GP with a general partner managed by him.  *Id.* ¶ 23.  This could only be true if Peel had made a prior agreement with Langdon himself, as the rest of the LPAC had just learned of the dispute and had not made any decisions.  In fact, when Mssrs. Peel and Langdon informed the other large Limited Partners of the Fund (but not Mr. Kowski and Mr. Lueken) of the Founders' dispute, the LPAC sought advice on their rights and whether and how they might replace the general partner if at all necessary.  *Id.* ¶ 24.

### C.  The LPAC Backs Peel's Pitch to Remove Novalpina GP

The Limited Partnership Agreement ("LPA"), which is the document prescribing governance of the Fund, had a "no fault divorce" clause for the general partner, but invoking it carried expensive consequences.  Where removal was without cause, as Novalpina GP's removal would be here, it would be owed a Priority Profit Share (a priority allocation of net income and capital proceeds) within 20 days or the removal would not take effect.  Additionally, the Carried Interest Partner had to be paid a Removal Entitlement based on the value of the Fund on the date of the "no fault" removal vote, as determined by an independent valuer appointed by the general partner.  Finally, the new general partner had to buyout the Sponsor Commitment—the initial investment in the Fund, also at the value determined by an independent valuer appointed by the outgoing general partner.  *Id.* ¶ 25.  Thus, replacing Novalpina GP could cost hundreds of millions of euros.  This is a very significant amount of money; the Fund's limited partners had contributed only €548 million as of 30 June 2021.  *Id.* ¶ 26.

Finding a general partner willing to buy the Sponsor Commitment and paying the Removal Entitlement and Priority Profit Share from the Fund was not an attractive proposition to the LPAC.  But Mr. Peel came up with a proposal to make it attractive:  he would compensate

the Fund for the "divorce" payments, should the LPAC, following the "no fault divorce" from Novalpina GP, install an entity controlled by him alone as new general partner of the Fund. Peel would then be able to capture all of the management fees and future carried interest entitlements for himself. To sweeten the deal, Peel promised the LPAC that his family trust would fund the cost of "independent" lawyers to advise the LPAC on the replacement of Novalpina GP with Peel himself or an entity he controlled, which posed a serious conflict of interest. He further assured the LPAC that he would indemnify them and the Fund from any legal fallout and offered to take steps that would reduce the Fund's management fees to limited partners. *Id.* ¶ 27.

This entreaty succeeded with the LPAC. *Id.* The proposal dispensed with the problem of the Founders' conflict and for no extra cost. Michael Langdon, on behalf of OPERF, was essential to Peel's takeover attempt. Langdon served as Chairman of the LPAC and commanded more than 20% of the voting interests in the Fund. Langdon had arrived at the Oregon Treasury Division in 2015. *Id.* ¶ 16. Under his leadership, OPERF's private equity investments expanded from 20% of the investment portfolio—the then-authorized cap—to a whopping 28%. *Id.* ¶¶ 28–29. While those investments have performed very well in terms of absolute value, the realized value has been less exceptional given infrequent distributions. *Id.* ¶ 30. The Investment Council that oversees OPERF has refused to authorize an increase in private equity spending, and Langdon has chosen to offload investments to improve liquidity. *Id.* ¶¶ 29–30, Ex. 7. Although the Novalpina investment was just one of many private equity investments made by Oregon, Langdon could influence Mr. Peel should he take over the Fund's management successfully. And Mr. Peel's proposal to compensate the Fund for the potentially hundreds of millions in contractual liabilities payable to the Novalpina entities, should investors appoint an entity solely

controlled by him as new general partner, left more of the Fund's assets for distributions to limited partners like OPERF.

### D.  Installing Peel Managers to Approve the Replacement of the General Partner

In March 2021, the Luxembourg Court of Appeals decided ex parte to stay the January 10, 2021 TopCo resolution that suspended Mr. Peel's voting rights.  As a practical matter, it became very difficult without the consent of Mr. Peel to change the manager of TopCo, Group GP and therefore Novalpina GP.  *Id.* ¶ 31.  Mr. Peel had convinced the captive managers of Novalpina GP—Allen Foley, Gaëtan Dumont and Philip Zarb Mizzi (the "Peel Managers")— to back his plan.  It is assumed that, in exchange for breaching their fiduciary duties, Mr. Peel assured the Peel Managers that they would continue to hold lucrative positions on many boards of directors and collect service fees once investors had appointed Mr. Peel's entity as new general partner of the Fund.  From April to June 2021, Michael Langdon engaged in direct discussions with the Peel Managers of Novalpina GP to accomplish the desired replacement of Novalpina GP and the installation of Stephen Peel.  *Id.* ¶ 32.  The Peel Managers were prepared to take steps to effectively waive Novalpina GP's contractual rights and those of other Novalpina entities to facilitate Mr. Peel's takeover.

It did not go as planned.  On July 7, 2021, the Luxembourg Court of Appeal reinstated the January 10, 2021 resolution suspending Mr. Peel's voting rights in the Novalpina entities. The court ruled that Peel Peel's description of the facts in his ex parte request was inaccurate, did not correspond to reality, and that he had misled the court.  As a result of this finding, the Peel Managers lost their positions on the board of TopCo and new, independent managers Michael Zini and Stefano Pileri, neither of whom had any connection to the Founders, were appointed the same day.  *Id.* ¶ 33.

Despite this setback, Mr. Peel's plan had momentum and the support of Michael Langdon and several important members of the LPAC; the LPAC had scheduled the vote on the "no fault divorce" for July 9, 2021.  The new Novalpina GP/Group GP managers nevertheless carried out their duties in respect of the Novalpina entities.  The Peel Managers had taken actions to ensure that the Group GP defaulted on payment of a capital call; at the request of the AIFM, Zini and Pileri cured it.  Certain credit facilities in which the Fund invested required continuity of control during the term of the investment.  On July 8, 2021, the directors of Novalpina GP together with the four other shareholders of Master Luxco (which held those investments) amended the articles of incorporation to require unanimity for any shareholder resolution.  In this way, they preserved the argument that the shareholder in control at the time of issuance of the credit facilities retained at least a form of control and staved off a cascade of additional capital requirements, calls for repayment, and regulatory defaults.  *Id.* ¶ 34.

The next day, July 9, 2021, the limited partners including those represented on the LPAC voted on the "no fault divorce"; Novalpina GP would be formally replaced once the prerequisites in the LPA had been satisfied.  That is, Novalpina GP, Group GP, and the Carried Interest Partner needed to be paid.  The exact amount of the Sponsor Commitment and Removal Entitlement would be determined by a professional independent valuation firm appointed by Novalpina GP with the approval of the LPAC.  *Id.* ¶ 35.  Appointing an independent valuer to conduct the contractually agreed valuation was indeed possible—Petitioner even had a rough estimate.  On the basis of a valuation of the Fund's assets (in the ordinary course and not for the no-fault divorce) conducted by Ernst & Young, the Fund's independent AIFM and the Fund's administrator determined that, as of July 30, 2021, the Sponsor Commitment owed to Group GP

and the Carried Interest Partner would be 40,558,946 euros and the Removal Entitlement, 282,925,127 euros.  *Id.* ¶ 36.

Mr. Kowski suspected that Mr. Peel would not play fair in the transition to the new general partner, and so he immediately instituted injunction proceedings in the UK to prevent the appointment of Peel's general partner entity.  *Id.* ¶ 37.  The LPAC—*knowing* that Mr. Peel was not playing fair because they were in on the plan themselves and knew he was breaching his clear and enforceable restrictive covenants at the level of TopCo and the Investment Advisors — likely realized that the injunction would stick.  To keep the Fund operating, the LPAC believed it had to move quickly:  a new general partner had to be appointed within 20 days of the "divorce" vote.  Novalpina GP likewise had to be paid the Priority Profit Share or its removal would not take effect.  They thus abandoned the plan to install Mr. Peel as general partner and sought a Plan B.

Michael Langdon had one:  he proposed to the LPAC that an associate of Berkeley Research Group, BRG Asset Management LLC—a US consulting firm specializing in internal disputes—serve as the new general partner of the Fund.  *Id.* ¶ 38.  The nature of Langdon's prior connection to BRG Asset Management is unknown to Petitioner, but Langdon had the support of the LPAC and the benefit of an emergency to push his choice through.  NOAL GP—a Luxembourgish affiliate of BRG Asset Management LLC—was created on July 30, 2021and nominated as the general partner on August 6, 2021, 20 days after Novalpina GP was voted out.  However, per the LPA, NOAL GP could not be appointed until the Sponsor Commitment had first been acquired.  For this, there had to be an independent valuation and then payment.  In a constructive effort to provide more time to the Fund's limited partners Novalpina GP proposed and agreed to extend the time period for these steps from 20 to 35 business days.  *Id.*

However, the LPAC and NOAL GP had no interest in abiding by the terms of the LPA. Proskauer Rose, partially sponsored by Stephen Peel but acting for eight investors represented on the LPAC, asked that Novalpina GP nominate a Big 4 accounting firm as the independent valuer of the Fund, but then rejected all those proposed, including Ernst & Young Luxembourg, Ernst &Young London and Deloitte.  *Id.* ¶ 39.  This cycle of rejection consumed time, of which there was not enough.  This is where Stephen Peel provided again critical assistance:  In August 2021, he filed a new ex parte application with the Luxembourg First Instance Court that had the effect of temporarily reinstating the Peel Managers.  Reinstated, in mid-August, Mssrs. Foley, Dumont and Zarb Mizzi entered into a Transition Agreement with BRG Asset Management LLC.  *Id.* ¶ 40.  Although Stefan Kowski intervened to challenge this action (*id.*), and his counsel repeatedly warned the LPAC and NOAL GP that if successful his action would nullify all actions taken by the Peel Managers on behalf of Novalpina GP during the interim suspension, the LPAC, NOAL GP, and the Peel Managers were undeterred.

On August 27, 2021 (the last day of the 35 business days period), NOAL GP registered itself as new general partner of the Fund.  It had not acquired the Sponsor Commitment, nor had an independent valuer been appointed to determine the value of the Fund for purposes of the acquisition of the Sponsor Commitment and the Removal Entitlement.  *Id.* ¶ 41.  For this reason, Petitioner maintains that, to this day, NOAL GP is unlawfully exercising control over the Fund. Per a new LPA signed, without having the authority to do so, by NOAL GP, the Sponsor Commitment and Removal Entitlement could be dealt with in the future, in accordance with new "valuation principles" that NOAL GP agreed with the Peel Managers on behalf of Novalpina GP and Group GP aimed at decoupling the obligation to pay the Sponsor Commitment from the removal of the general partner, thus allowing NOAL GP's appointment to become fully effective

without paying anything to the Novalpina entities.  NOAL GP excused itself from its obligations to acquire the Sponsor Commitment by purporting to amend the Limited Partnership Agreement to allow the Fund to acquire the Sponsor Commitment and issue promissory notes to the Novalpina entities for whatever sum was due to them once the valuation took place.  *Id.* ¶ 42.

NOAL GP promised to make progress on agreeing to implement the valuation principles and the LPAC and NOAL GP agreed that they would appoint KPMG London as independent valuer to value the Fund.  Once the valuation occurred, they claimed, they would pay the Sponsor Commitment and Removal Entitlement, both of which depended on the value of the Fund as of August 1, 2021.  *Id.* ¶ 43.  However, NOAL GP stalled and hemmed and hawed and obfuscated.  Finally, in November 2021, NOAL GP admitted what had been true since the beginning:  it would not appoint an independent valuer nor make the payments.  It argued it was unwilling to agree to appoint any valuer because it believed that a valuation on the basis of the agreed principles would be "infeasible (and was always unworkable)."  *Id.* ¶ 44.

The independent valuation, as contractually required in the LPA, never happened.  *Id.*  It became apparent that it was never going to, and that Novalpina GP's purported agreement to post-hoc payments had been secured by the fraud of its Peel Managers, aided and abetted by Langdon and NOAL GP.  NOAL GP continues to occupy the role of general partner *de facto*, but the legal authority for it to continue in this position is far from settled and is the subject of ongoing litigation.

### E.  Ongoing Abuse of Power – Laboratoire XO Sale

In the meantime, Michael Langdon appears to have continued to grant lucrative favors to entities known to him.  For example, in October 2022, Laboratoire XO, one of the Fund's portfolio companies, was sold to Stanley Capital Partners, which bid €20 million less than the

highest bidder.  Declaration of Michael Zini ¶ 10, 13.  Stanley Capital Partners was introduced as

a bidder by Michael Langdon.  *Id.* ¶ 9.  The French investment bank Neuflize OBC ran the

bidding and sale process for Laboratoire XO.  *Id.* ¶ 3.  One of Neuflize's employees, Anthony

Gribe, called Novalpina GP director Michael Zini and informed him that Stanley Capital Partners

would be given preference because of its unique relationship with Michael Langdon, the

representative of the Fund's largest investor, even though it had a lower bid and had to raise

capital to fund the acquisition.  *Id.* ¶ 10.

### F.  Ongoing Litigation by Novalpina GP in the Luxembourg Courts

On December 8, 2021, the Luxembourg Court of Appeal ordered Zini and Pileri restored

to their duties as managers of the Novalpina entities with retroactive effect to August 4, 2021.

The natural consequence of this decision is that the resolutions, decisions and acts made by the

Peel Managers on behalf of the Novalpina entities are not valid.  Thieltgen Decl. ¶ 45.  On

December 9, 2022, Zini and Pileri obtained commercial judgments on the merits nullifying all

internal decisions of the Peel Managers on behalf of Novalpina GP, Group GP and the Carried

Interest Partner, including to enter into the Transition Agreement with BRG Asset Management

LLC, and related agreements.  *Id.* ¶ 46.

There are three pending lawsuits in Luxembourg filed by Novalpina GP in the District

Court of Luxembourg.  The first seeks nullification of the unlawful decisions made by the Peel

Managers to appoint new directors to the board of Master Luxco and the subsequent decisions

made by them.  The second is a straightforward contract dispute and seeks to remedy the

breaches of the LPA.  As relief, Novalpina GP seeks either to be temporarily reinstated until the

conditions of the LPA have been fulfilled, or damages in satisfaction of the conditions precedent,

*i.e.*, it wants the Novalpina entities to be paid the millions of euros owed by the LPA's terms.  A

third action aims to preserve the ability to collect the payment due under the LPA.  The Carried

Interest Partner—represented by Petitioner—filed attachment proceedings to enjoin the

distribution of Fund assets until the Removal Entitlement, which takes priority over any other

distributions, is paid.  *Id.* ¶ 47.

## G.  Legal Proceedings for Which Evidence is Sought

### 1.  Defense Against New Lawsuit

Novalpina GP does not file this Petition in connection with any of the above-described

lawsuits.  It files this Petition to obtain evidence with which to defend itself against a recent

lawsuit brought by NOAL GP.  On September 22, 2022, more than a year after it seized control,

NOAL GP sued Novalpina GP and directors Zini and Pileri in the Commercial Chambers of the

District Court of Luxembourg, alleging that they were part of a sprawling fraud that culminated

in changing the bylaws of Master Luxco to require unanimity among shareholders.  *Id.* ¶ 9, Ex. 1.

NOAL GP claims that the Peel Managers replaced by Zini and Pileri in July 2021 were the *truly*

independent directors, a contention that Petitioner vehemently disputes.  It was the Peel

Managers (Foley, Zarb Mizzi and Dumont) who actually conspired with certain LPAC directors

and NOAL GP to effectively cripple the Novalpina entities' rights to the Removal Entitlement

and Sponsor Commitment and ratify decisions wholly contrary to the interests of the corporate

entities to which they owed a fiduciary obligation.  It is inconceivable that the Peel Managers

independently arrived at the conclusion that they should breach their fiduciary duties and forego

several hundred million dollars owed to the corporations they were required to protect.  Foley

and Dumont have been handsomely rewarded and now serve in manager positions in 17

Luxembourg entities presently controlled by NOAL GP; Foley is also a manager of NOAL GP

itself.  Zini Decl. ¶ 14.  Documents and communications establishing the conspiracy to enter into

agreements knowing that they lacked the legal authority to do so will enable Novalpina GP to mount an effective defense to NOAL GP's lawsuit.

### 2. Evidence in support of contemplated civil fraud claim

The evidence sought from respondent will also form the basis for Novalpina GP's contemplated claim of civil fraud against Michael Langdon, the Peel Managers, and NOAL GP, all of whom have conspired to defraud the Novalpina entities of their rights and act in their own self-interest. Civil fraud is a claim available to Petitioner under Luxembourg law and may be brought against directors for abuse of power, mismanagement or a deliberate violation of the company's LPA. Thieltgen Decl. ¶ 48. The civil fraud claim will be based on acts undertaken by Langdon with malice and deceit, including by conspiring with Mr. Peel to effect the takeover while forcing a breach of the LPA, by bringing in a general partner with whom he had a prior relationship to help effectuate that breach, and by lying about the valuation of the Fund. The claim will also allege that the Peel Managers' abdicated Novalpina GP's contractual rights under the LPA in order to secure lucrative manager positions in entities presently controlled by NOAL GP, which also constitutes fraud under Luxembourg law. *Id.* ¶ 49.

NOAL GP, the Peel Managers, and Langdon continued to push forward despite their knowledge that the actions they took were likely invalid under applicable law, as explained by Stefan Kowski after he filed for an injunction in August 2021. Fraud is evident from NOAL GP's claim in November 2021 that a valuation of the Fund could not be performed on the principles agreed just weeks before to secure the deal. NOAL GP thus excused the limited partners, investors, and itself from paying hundreds of millions of euros for the Removal Entitlement and Sponsor Commitment. These deceptive actions have served the interests of the perpetrators. NOAL GP benefits from continuing to collect management fees. The Peel

Managers enjoy lucrative directors' positions, as well as indemnification, courtesy of the Fund that's now managed by NOAL GP.

Michael Langdon has also personally benefitted.  By swiftly bringing in BRG Asset Management LLC ("BRG AM"), he ensured that his secret, unlawful agreement with Peel to support his takeover has not come to light.  His retention of BRG AM paid off:  it installed a general partner that promptly violated the LPA, so that Langdon's conspiracy would not cost the Fund over 300 million euros.  This investment has become a nightmare for his client; the Oregon attorney general reported efforts to get out of the investment without breaching contractual obligations.  *Id.* ¶ 50.  Langdon is no doubt eager to be done with it.  He has since pushed through the sale of LXO, a major Fund asset, to a close associate of Stephen Peel, Simon Cottle of Stanley Capital Partners, even though he bid nearly €20 million less for it than the highest bidder.  Zini Decl. ¶ 10.

Petitioner will file this action in the Luxembourg District Court and seek restitution in the form of a clawback of undue payments to NOAL GP and the Peel Managers and request the court to nullify all actions taken on the basis of this fraud.  Thieltgen Decl. ¶ 51.

### H.  Respondents and Discovery Sought

Petitioner seeks an order authorizing the issuance of a subpoena for testimony and documents from Michael Langdon.  As a witness to and participant in the takeover of Novalpina by BRG AM, Mr. Langdon will have relevant information in documents, texts, emails, and testimony about whether he, as the largest limited partner, intended to ensure that the Limited Partner Agreement was honored and the amounts owed to Novalpina GP and related entities paid.  Mr. Langdon was also involved in the sale of Laboratoire XO and securing the bid of Stanley Capital Partners, an abuse of his power in violation of Luxembourg law.

This Petition also seeks discovery from Tobias Reed, the State Treasurer of Oregon; Mr. Reed is the head of the Oregon State Treasury, which oversees the Investment Division in which Michael Langdon works.  Declaration of Tara J. Plochocki ¶¶ 3-4.  As the head of the department, Mr. Reed has ultimate possession, custody, or control of emails sent to or from Michael Langdon from his Oregon State Treasury email address.  At all relevant times, Mr. Langdon's email address was Michael.Langdon@ost.state.or.us.  Plochocki Decl. ¶ 5.  When typed as a URL, this domain directs internet users to the Oregon State Treasury homepage.  *Id*. Petitioner seeks copies of emails to or from Mr. Langdon relating to the NOAL GP takeover, including his correspondence with Stephen Peel, as well as correspondence relating to the sale of Laboratoire XO.  These documents are expected to adduce Mr. Langdon's known wrongful collusion with Mr. Peel, his determination to undermine the Novalpina entities' contractual right to payment under the LPA, and his abuse of power in forcing through the weaker bid of Mr. Peel's friend for Laboratoire XO.

## LEGAL ARGUMENT

Section 1782 petitions must meet three statutory requirements.  *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019).  Courts also consider four discretionary factors, bearing in mind Section 1782's twin aims of "providing efficient means of assistance to participants in international litigation" and "encouraging foreign countries by example to provide similar means of assistance to our courts."  *In re Letter of Request from Loc. Ct. in Kusel, Germany*, No. 1:22-CV-01009-CL, 2022 WL 5142753, at *4 (D. Or. Oct. 5, 2022) (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004)).

**A.  The Petition Meets All Three Statutory Requirements of 28 U.S.C. § 1782**

This petition meets the three statutory requirements of Section 1782.  The statute requires that: (1) the person from whom the discovery is sought "resides or is found" in the district of the district court where the application is made; (2) the discovery is "for use in a proceeding in a foreign or international tribunal"; and (3) the application is made by a foreign or international tribunal or "any interested person." *Khrapunov*, 931 F.3d at 925 (quoting 28 U.S.C. § 1782) (citing *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)). The petition meets each.

**1.  Mssrs. Read and Langdon Reside or are Found in Oregon.**

Mssrs. Langdon and Read are persons residing in Oregon.  Mr. Langdon is employed by the Oregon State Treasury Investment Division, which maintains offices at 16290 SW Upper Boones Ferry Road, Tigard, Oregon.  Plochocki Decl. ¶ 4, Ex. 2.  This is also the address for the Office of the State Treasurer, which is occupied by Mr. Read.  *Id.*  Further, Michael Langdon's LinkedIn page indicates that he is in the Portland, Oregon Metropolitan area.  *Id.* ¶ 6.  Mr. Read's profile on the Oregon State Treasury website indicates that he lives in Beaverton, Oregon with his family.  *Id.* ¶ 7, Ex. 4.  Respondents therefore reside or are found in the District of Oregon, and the petition meets Section 1782's first statutory requirement.  *In re Republic of Ecuador*, No. C-10-80225, 2010 WL 3702427, at *1 (N.D. Cal. Sept. 15, 2010) (granting application seeking evidence from resident respondent).

**2.  Petitioner's requested discovery is for use in a pending and an anticipated foreign proceeding in Luxembourg.**

The Petitioner is defending a suit and contemplating another in Luxembourg.  Both matters satisfy the statute's second requirement.

The pending suit brought by NOAL GP against Novalpina GP satisfies this second statutory requirement.  In *In re Nouvel, LLC*, the court granted an application seeking discovery for use in defending against an action brought against petitioner in Luxembourg.  *In re Nouvel, LLC,* No. 22-MC-0004-MCS(EX), 2022 WL 3012521, at *5 (C.D. Cal. June 8, 2022), *report and recommendation adopted*, 2022 WL 2901715 (July 22, 2022), *appeal dismissed*, No. 22-55737, 2022 WL 16645081 (9th Cir. Oct. 18, 2022).   The lawsuit at issue here, filed on September 22, 2022, is still in its early stages, and it is thus appropriate for a defendant to gather evidence to introduce in a later phase of the proceedings.

Petitioner's contemplated lawsuit for civil fraud also satisfies the "for use" requirement of § 1782.  The statute's requirement of obtaining evidence "for use" in a foreign proceeding "does not limit the provision of judicial assistance to 'pending' adjudicative proceedings." *Intel*, 542 U.S. at 258; *In re Will Co. Ltd.*, No. 21-MC-80211-JCS, 2021 WL 5322653, at *2 (N.D. Cal. Nov. 16, 2021) ("§ 1782 does not require that a formal proceeding in the foreign jurisdiction is currently pending, or even imminent; rather, a court may permit discovery under § 1782 so long as a 'dispositive ruling' by the foreign adjudicative body is within 'reasonable contemplation'") (internal citation omitted).  In fact, Congress specifically removed the word "pending" from the statute in 1964.  S. Rep. No. 1580, 88th Cong., 2d Sess., 7 (1964). Actions reasonably contemplated at the time a petition is filed therefore meet the statute's "for use" requirement. *In re Will Co. Ltd.*, 2021 WL 5322653, at *2  (Japanese company seeking discovery to identify defendants for intellectual property suit in Japan satisfied "for use" requirement). Proclaiming the intent to file suit and articulating a legal theory for that suit satisfies this requirement. *Id.* (factor met where declaration stated intent to enforce intellectual property rights and move forward with civil claims).

Here, Petitioner has adduced the basis for its contemplated civil fraud claim to be filed in the District Court of Luxembourg.  The unity of position between NOAL GP and Michael Langdon, on the one hand, and the Peel Managers, on the other, concerning the subversion of Novalpina GP's contractual right to payment belies bad faith.  Further, NOAL GP's claim that valuation was impossible, thus excusing itself from making the Removal Entitlement or Sponsor Commitment payments just after the ink on its appointment had dried is literally unbelievable and makes sense only in a scheme where it never intended to make the payments to begin with.

### 3. Petitioner is an "interested person," since Petitioner is a defendant in one and will be a plaintiff in another Luxembourgian action.

Petitioner is an "interested person" for purposes of Section 1782.  The statutory term "interested person" encompasses both parties and contemplated parties to foreign litigation.  *In re Will Co. Ltd.*, 2021 WL 5322653, at *2 ("A litigant in a foreign action qualifies as an 'interested person' under § 1782") (internal citations omitted); *see also* 28 U.S.C. § 1782; *Intel*, 542 U.S. at 256 ("the text of § 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant'"); *In re Willway Co., Ltd.*, No. 22-MC-80310-BLF, 2022 WL 17331258, at *3 (N.D. Cal. Nov. 29, 2022) ("A litigant in a foreign proceeding is an 'interested person' for purposes of Section 1782.  As the putative plaintiff, Willway qualifies as an 'interested person.'") (internal citation omitted); *see In re Furstenberg Fin. SAS*, 785 F. App'x 882, 885 (2d Cir. 2019) (concluding that petitioners intending to file a criminal complaint in Luxembourg were "interested persons").

Here, Petitioner is both a defendant in a proceeding and the would-be plaintiff in another, and thus meets the third statutory requirement of Section 1782. Petitioner thus meets the third statutory requirement of Section 1782.

For these reasons, Petitioner meets the three statutory requirements of Section 1782, and thus the Court should turn to the discretionary factors outlined by the Supreme Court in *Intel*.

**B. The Court Should Grant this Petition in Its Discretion**

Granting this Petition is an appropriate exercise of this Court's discretion.  The Supreme Court articulated four factors to consider in exercising discretion under Section 1782. *See Intel*, 542 U.S. at 264-65; *London v. Does 1-4*, 279 F. App'x 513, 515 (9th Cir. 2008); *In re Letter of Request from Loc. Ct. in Kusel, Germany*, 2022 WL 5142753, at *4.  Courts consider these factors collectively, not as stand-alone categorical imperatives, and with Section 1782's twin aims of "providing efficient means of assistance to participants in international litigation" and "encouraging foreign countries by example to provide similar means of assistance to our courts" in mind.  *In re Letter of Request from Loc. Ct. in Kusel, Germany*, 2022 WL 5142753, at *4 (internal citation omitted).  Each factor weighs in Petitioner's favor.

**1. The discovery sought is beyond the reach of the Luxembourg courts.**

First, courts consider whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for Section 1782(a) aid generally is not as apparent.  *In re Borrelli*, No. 20-MC-80154-JSC, 2020 WL 5642484, at *2 (N.D. Cal. Sept. 22, 2020); *In re Glob. Energy Horizons Corp.*, No. 5:15-MC-80078-PSG, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015).  "Although the case law at times refers to whether the 'person' is within the foreign tribunal's jurisdictional reach, the key issue is whether the material is obtainable through the foreign proceedings."  *In re Joint Stock Co. Raiffeinsenbank*, No. 16-MC-80203-MEJ, 2016 WL 6474224, at *4 (N.D. Cal. Nov. 2, 2016) (internal citations omitted).  And the first *Intel* factor does "not 'preclude § 1782 discovery of parties participating in the underlying international proceeding.'"  *In re Porsche Automobil Holding SE*, No. 15-MC-417

(LAK), 2016 WL 702327, at *7 (S.D.N.Y. Feb. 18, 2016), quoting *In re Auto-Guadeloupe Investissement S.A.*, No. 12-mc-221 (RPP), 2012 WL 4841945, at *5 (S.D.N.Y. Oct. 10, 2012).

Mr. Read is not and will not be a party to either the pending or contemplated Luxembourg proceedings. Michael Langdon is not currently a party in either proceeding for which discovery is sought; that he will be named as an individual defendant in the contemplated fraud action does not, of course, mean that Petitioner has access to information he possesses now. Mr. Langdon does not maintain a presence in Luxembourg and Luxembourg courts do not have extraterritorial competence and could not compel him to produce the evidence sought. Thieltgen Decl. ¶ 52.

Courts have granted petitions in similar circumstances, particularly where, like here, Petitioner lacks an effective discovery mechanism in the foreign jurisdiction to procure the requested discovery. *Matter of Lufthansa Technick AG*, No. C17-1453-JCC, 2019 WL 331839, at *2 (W.D. Wash. Jan. 25, 2019) (first factor weighed in petitioner's favor where intervenor was party to German, French, and UK proceedings, which lacked effective discovery mechanisms). In *Lufthansa Technik v. Panasonic Avionics Corp.*, No. C17-1453-JCC, 2017 WL 6311356, at *2 (W.D. Wash. Dec. 11, 2017), the court noted that in dealing with a prior § 1782 application, the fact that it targeted a party to a pending proceeding was "somewhat vitiated by the jurisdictional limitations of the German court." Thus, even where a request is directed at a party to the foreign proceedings, the first *Intel* factor weighs in the petitioner's favor if the evidence is otherwise out of reach. *Id.; see In re Nouvel, LLC*, 2022 WL 3012521, at *4 (concluding discovery could be had against participant in foreign proceeding because [s]ufficient doubt pervades the issue of the alleged availability of the subject discovery directly from the Luxembourg court that this factor should weigh in favor of facilitating the discovery here."); *see In re Vahabzadeh*, No. 20-MC-

Petitioner's Memorandum of Law in Support of
Ex Parte Petition Pursuant to 18 U.S.C. § 1782

80116-DMR, 2020 WL 5095131, at *3 (N.D. Cal. Aug. 28, 2020) ("Mostafa is a party to the

French proceedings.  However, according to Petitioner's counsel, the documents Petitioner seeks

to obtain from Mostafa in California are outside the reach of the French court's jurisdiction….

Thus, the first factor weighs in Petitioner's favor."); *Matter of Lufthansa Technick AG*, No. C17-

1453-JCC, 2019 WL 280000, at *2 (W.D. Wash. Jan. 22, 2019) (discovery beyond French

court's reach weighed in favor of granting petition against respondent who was party to French

proceeding).

Here, the documents and deposition testimony sought from Michael Langdon are beyond

the Luxembourg courts' power.  Thielgten Decl. ¶ 52.  The first discretionary factor weighs in

favor of granting the Petition.

### 2. There is no evidence that Luxembourgish Courts in the pending and contemplated lawsuits would reject discovery obtained through the Petition.

Second, the Court may consider "the nature of the foreign tribunal, the character of the

proceedings underway abroad, and the receptivity of the foreign government or the court or

agency abroad to U.S. federal-court judicial assistance."  *Intel*, 542 U.S. at 264.  Absent a clear

directive from the foreign nation that specifically addresses the use of evidence gathered under

foreign procedures, district courts may look to treaties facilitating such cooperation, like the

Hague Evidence Convention, or case law demonstrating receptivity, and they should be informed

by "Section 1782's overarching interest in providing equitable and efficacious procedures for the

benefit of tribunals and litigants involved in litigation and international aspects."  *In re Joint*

*Stock Co. Raiffeinsenbank*, 2016 WL 6474224, at *5; *see In re Letter of Request from Loc. Ct. in*

*Kusel, Germany*, 2022 WL 5142753, at *4 (request made pursuant to Hague Evidence

Convention established foreign court's receptivity); *In re Ambercroft Trading Ltd.*, No. 18-MC-

80074-KAW, 2018 WL 2867744, at *4 (N.D. Cal. June 11, 2018) (citing other petition grants to

show country's receptivity).  The respondent bears the burden to show that the foreign tribunal would reject the evidence. *See Siemens AG v. W. Digital Corp.*, No. 8:13-CV-01407-CAS, 2013 WL 5947973, at *3 (C.D. Cal. Nov. 4, 2013).  The Court need not and should not dwell on the foreign law of evidence; the Luxembourg courts have the power to address the admissibility of the gathered evidence and can make that determination themselves.  *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) (regarding analysis of foreign law in the § 1782 context, "we do not read the statute to condone speculative forays into legal territories unfamiliar to federal judges"); *Matter of Lufthansa Technick AG*, 2019 WL 331839, at *2.

Luxembourg is affirmatively receptive to evidence obtained with the aid of other countries; it is member of the Hague Evidence Convention.[1]  Accordingly, courts have freely granted petitions seeking disclosure in support of Luxembourgish proceedings.  *See, e.g., In re Blue Skye Fin. Partners S.A.R.L.*, No. 22 MISC. 171 (KPF), 2022 WL 2441074, at *3 (S.D.N.Y. July 5, 2022) (pending Luxembourgish actions); *In Re Nouvel, LLC*, 2022 WL 3012521, at *1 (same); *In re Furstenberg Fin. SAS*, 334 F. Supp. 3d 616, 619 (S.D.N.Y. 2018) (contemplated Luxembourgish actions) (subsequent affirmance omitted).

The second discretionary factor weighs in favor of granting the Petition.

### 3.  The Petition does not circumvent Luxembourg's laws of evidence.

Third, the *Intel* Court has stated that a district court may consider whether the § 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  542 U.S. at 264-65.  Courts may ask whether the petitioner has "side-stepped" less favorable foreign rules, although a petitioner need not exhaust

---

[1] Hague Conference on Private International Law, Luxembourg Member Page, https://www.hcch.net/en/states/hcch-members/details1/?sid=51, accessed Jan. 23, 2023.

discovery attempts in the foreign jurisdiction before seeking aid via U.S. courts, *In re Joint Stock Co. Raiffeinsenbank*, 2016 WL 6474224, at *6.  Nor must a Petitioner show "that the discovery sought would be available in the foreign jurisdiction if that discovery were located in that jurisdiction," *In re Nouvel, LLC*, 2022 WL 3012521, at *4.

The evidence sought does not violate any public policy of Luxembourg.  Thieltgen Decl. ¶ 54.  That Petitioner cannot obtain the discovery sought in Luxembourg is indicative of only a technical limitation in how requests may be made, not what can be disclosed.  In the context of the lawsuit filed against Novalpina GP, the Luxembourg court could not order discovery unless the seeking party can specifically describe the document sought.  *Id* ¶ 53.  The fact that the Petitioner cannot divine which documents and communications exist does not mean that it is improper to seek them in a jurisdiction with broader disclosure laws.  Courts have granted § 1782 petitions relating to proceeding before foreign tribunals with restrictive disclosure laws on the basis that they would be otherwise unavailable and did not view those petitions as circumvention of foreign law.  *See In re Nouvel, LLC*, 2022 WL 3012521, at *4 (ordering disclosure in support of action in Luxmebourg); *In re Porsche Automobil Holding SE*, 2016 WL 702327, at *7-8 (granting petition where German courts limited petitioner's ability to procure discovery because they require very detailed descriptions of sought documents); *In re Auto-Guadeloupe Investissement S.A.*, 2012 WL 4841945, at *6 (permitting discovery where French courts required very detailed descriptions of sought documents).

### 4.  The requests relate to discrete and recent actions over a short time period.

Fourth, courts consider whether the discovery is unduly intrusive or burdensome.  *Intel*, 542 U.S. at 264-65.  Courts look to the familiar proportionate standard under the Federal Rules of Civil Procedure. *In re Joint Stock Co. Raiffeinsenbank*, 2016 WL 6474224, at *6.

Under those standards, the discovery sought is neither burdensome nor unreasonable. The desired documents and emails relate to Novalpina GP's defense against NOAL GP's lawsuit and whether distinct persons and entities conspired to avoid contractual requirements set forth in the LPA. Both lawsuits will require documents and communications about specific issues from a period of only two years, with most of the evidence generated over a period of just a few months, all in the files and/or inbox of a single person. The documentary evidence is likely entirely electronic and thus easily searchable and correspondence will involve only members of the LPAC, NOAL GP, Mr. Peel and representatives of specific companies, like Laboratoire XO and Neuflize. A draft of the document requests to be directed to Mssrs. Read and Langdon is attached to the Declaration of Tara J. Plochocki as Exhibit 5. The deposition of Michael Langdon will not be unduly burdensome because it will be similarly limited in scope.

Thus the discretionary factors articulated by the Supreme Court all weigh in favor of granting the Petition.

## CONCLUSION

For the foregoing reasons, the Ex Parte Petition for Judicial Assistance should be granted.[2]

Respectfully submitted,

**Dated:** January 27, 2023

/s Jesse D Mondry
Jesse Mondry
Harris Bricken LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
Jesse@harrisbricken.com

---

[2] There is no prejudice to respondents in granting a § 1782 petition ex parte; doing so is both common and proper (*In re Hornbeam Corp.*, 722 F. App'x 7, 11 (2d Cir. 2018)) and the Court may address any defenses on a Motion to Quash.

Tara J. Plochocki (DC Bar 989404)
Lewis Baach Kaufmann Middlemiss pllc
1101 New York Avenue NW
Suite 1000
Washington DC  20005
Tel. 202-659-7217
tara.plochocki@lbkmlaw.com
*Counsel for Petitioner Novalpina Capital
Partners I GP S.À.R.L.*