UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| **IN RE PETITION OF NOVALPINA CAPITAL PARTNERS I GP S.À.R.L. FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** | Case No.    3:23-mc-00082 IM |

**DECLARATION OF NICOLAS THIELTGEN IN SUPPORT OF EX PARTE PETITION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

I, Nicolas Thieltgen, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am a licensed attorney in Luxembourg and the managing partner of the law firm Brucher, Thieltgen & Partners in Luxembourg. I have served as counsel to Novalpina Capital Partners I GP S.à r.l. ("Novalpina GP") since 2021.

2. I submit this declaration in support of the Petition submitted by Novalpina GP for an order pursuant to 28 U.S.C § 1782 to take discovery from Tobias Read and Michael Langdon.

3. The knowledge set forth herein was acquired during my representation of Novalpina GP. Where information presented was derived from a source other than my clients, I have endeavored to provide a citation to the source.

**Relevant Facts**

4. Michael Langdon is the Director of Private Markets in the Oregon State Treasury Investment Division, where he recommends investments in private equity to be made on behalf of the Oregon Public Employees Retirement Fund.

5. At all relevant times, Langdon was the Chairman of the Limited Partner Advisory Committee ("LPAC") of Novalpina Capital Partners I SCSp (the "Fund").

6. Michael Langdon introduced BRG NOAL GP S.à.r.l. ("NOAL GP") to the Limited Partner Advisory Committee.

7. On December 8, 2021 the Court of Appeal of Luxembourg issued a judgment that had the effect of reinstating Michael Zini and Stefano Pileri as managers of Novalpina GP.

8. On December 9, 2022, the Second Chamber of the District Court of Luxembourg issued an order nullifying the resolutions made by the temporary managers of Novalpina GP between August 4, 2021 and December 8, 2021.

9. Attached hereto as Exhibit 1 is a true and correct copy of a lawsuit, and an English translation thereof, served on September 22, 2022 by NOAL GP et al. against Novalpina GP and its directors Stefano Pileri and Michael Zini, and NOAL Luxco S.à r.l., and filed before the Commercial Chamber of the District Court of Luxembourg.

10. Petitioner Novalpina GP is the former general partner of the private equity fund known as Novalpina Capital Partners I SCSp (the "Fund"), established in 2017.  The Fund was managed by Petitioner, assisted for the portfolio management by the Fund's independent Alternative Investment Fund Manager, LIS Sanne S.A.  The three founders of the Fund—Stefan Kowski, Bastian Lueken, and Stephen Peel managed Novalpina Capital LLP and Novalpina Capital Management International LLP ("Investment Advisors") which issued investment recommendations to the Fund's AIFM. The Founders held and continue to hold significant economic interests in the Fund through a series of entities organized under Luxembourgish law.  The Founders each hold one-third of Novalpina Capital Group S.à.r.l. ("Topco"), the ultimate parent corporation of the Petitioner and the rest of the Novalpina entities.

11. A wholly owned subsidiary of Topco—Novalpina Capital Partners I Group GP S.à.r.l. ("Group GP")—owns Novalpina GP and was one of three initial Limited Partners of the Fund. Group GP was the general partner of the second limited partner—Novalpina Capital Partners I FP SCSp (the "Carried Interest Partner"). The third and final initial limited partner was Mr. Peel's family trust. Together, the three initial limited partners committed a total of EUR 78.862 million to the Fund.

12. The Fund's equity in its portfolio companies is held in four companies, but the most significant assets are held by NVP 103 S.à.r.l., within a subsidiary holding company formerly called Novalpina Capital Partners I Luxco S.à.r.l. ("Master Luxco"). Novalpina GP remains a shareholder of Master Luxco.

13. The Fund added more than 70 additional Limited Partners over time, although the initial three limited partners together comprised the second-largest investment bloc. To the benefit of all investors, the Fund's performance exceeded expectations. The Fund had invested in and then consolidated one of Europe's largest licensed casino and gambling enterprises, a leading French specialty pharmaceutical company, and, with the strong support of Michael Langdon, the NSO Group, maker of the controversial software Pegasus.

14. Attached hereto as Exhibit 2 is a true and correct copy of an article titled "Oregon public pension fund gave blessing to NSO Group deal, sources suggest," published by The Guardian on January 17, 2022.

15. The Fund's investments yielded a considerable profit, with many millions available to distribute upon a future realization. Group GP and the Carried Interest Partner stood to gain considerable earnings; the latter also had an approximately 17% stake in the Fund's profits. The ultimate beneficial owners of these earnings were the Founders, who each owned a

third of TopCo and were therefore entitled to split the profits and distributions, if the Novalpina limited partners chose to distribute any, in thirds.

16. Attached hereto as Exhibit 3 is a true and correct copy of an article titled "Oregon hires LP veteran Michael Langdon to head private equity," published by Buyouts Magazine on September 9, 2015.

17. Attached hereto as Exhibit 4 is a true and correct copy of an article titled "Langdon to leave Hermes GPE as firm choose NYC over Boston," published on Buyouts Magazine on April 23, 2015.

18. In or around November 2020, Stephen Peel sought to obtain a greater share of the profits of the Fund and devised a plan with the support of certain Limited Partners in the Fund to increase his takings. Among the Founders, Stephen Peel was the primary point of contact for investor relations, while Stefan Kowski and Bastian Lueken focused more on investment strategies.

19. Mr. Peel solicited Mr. Kowski's support in persuading the Limited Partners to push out Mr. Lueken. Peel's plan was to hold the Investment Advisors and TopCo hostage by refusing to approve any actions; both entities required unanimous approval of the Founders on all investment recommendations and resolutions. Mr. Kowski refused and instead aligned with Mr. Lueken and each committed to upholding their fiduciary duties to the Novalpina entities.

20. In December 2020, Mr. Peel started blocking important investment and management decisions within the Investment Advisers and TopCo.

21. Unbeknownst to Kowski and Lueken, Peel was not acting alone. In December 2020, Peel secretly contacted Langdon, seeking his support. They kept this conversation from the other Founders and the members of the LPAC.

22. Mssrs. Kowski and Lueken notified TopCo's other four managers of Mr. Peel's obstruction, and on January 10, 2021, the managers unanimously authorized the partial suspension of Mr. Peel's voting rights in TopCo so that the Novalpina entities could continue to function.

23. When Mr. Peel filed his ex parte challenge to the suspension in February 2021, he indicated that if the dispute was not resolved, the LPAC would replace Novalpina GP with a general partner managed by Peel himself.

24. When Mssrs. Peel and Langdon informed the other large Limited Partners of the Fund (but not Mr. Kowski and Mr. Lueken) of the dispute between the Founders, the LPAC sought to understand from the Founders what the LPAC's rights would be if the dispute could not be resolved and whether and how they might replace the general partner if necessary.

25. The Limited Partnership Agreement ("LPA") governed Fund administration. It had a "no fault divorce" clause allowing removal of the general partner by the LPAC. Under the terms of the LPA, Novalpina GP's removal would trigger a duty to pay it the Priority Profit Share—a priority allocation of net income and capital proceeds—within 20 days or the removal would not be effective. The Carried Interest Partner would be owed a Removal Entitlement based on the value of the Fund on the date of when the "no fault" removal vote was passed, as determined by an independent valuer appointed by the outgoing general partner. And the new general partner had to buyout the Sponsor Commitment—the initial investment in the Fund by the original limited partners. Thus, replacing Novalpina GP

could cost the Fund hundreds of millions of euros. This is a very significant amount of money.

26. As of 30 June 2021, the Fund's limited partners had contributed only €548 million.

27. As conveyed by my client, Stephen Peel proposed the LPAC would replace Novalpina GP with an entity controlled solely by him, enabling Peel to capture all of the management fees for himself. Mr. Peel claimed to the LPAC that he could install a new general partner without having to make the bulk of the "divorce" payments. He further promised the LPAC that his family trust would fund the cost of "independent" lawyers to advise the LPAC on the replacement of Novalpina GP. He also agreed to indemnify the LPAC from any legal fallout and offered to take steps that would reduce the Fund's management fees to limited partners. The LPAC agreed.

28. Attached hereto as Exhibit 5 is a true and correct copy of an article titled "Oregon Public Employees powers to 6.3% return on strength of private equity," published by Pensions & Investments on September 9, 2022.

29. Attached hereto at Exhibit 6 is a true and correct copy of an article titled "Oregon council demands more options to counter PE overexposure," published by Buyouts Magazine on November 2, 2022.

30. Attached hereto as Exhibit 7 is a true and correct copy of an article titled "Private equity boom also holds challenges for Oregon," published by top1000funds.com on February 8, 2022.

31. On March 24, 2021, the Luxembourg appellate court decided ex-parte to stay the January 10, 2021 TopCo resolution that suspended Mr. Peel's voting rights. As a practical matter, it

became very difficult without the consent of Mr. Peel to change the manager of TopCo, Group GP and therefore Novalpina GP.

32. Mr. Peel had obviously convinced the captive managers of Novalpina GP—Allen Foley, Gaëtan Dumont and Philip Zarb Mizzi (the "Peel managers")—to back his plan. These directors were prepared to take steps to effectively minimize and waive Novalpina GP's contractual rights and those of other related Novalpina entities for the sake of Mr. Peel's takeover. It is assumed that, in exchange for breaching their fiduciary duties, Mr. Peel assured them that they would continue to hold lucrative positions on many boards of directors and collect management fees. In the period of April to June 2021, Michael Langdon engaged in direct discussions with the Peel managers of Novalpina GP to accomplish the desired replacement of Novalpina GP and the installation of Stephen Peel.

33. On July 7, 2021, the Luxembourg appellate court reinstated the resolution suspending Mr. Peel's voting rights in the Novalpina entities. The court ruled that Peel's description of the facts in his ex-parte request was inaccurate, did not correspond to the reality, and that he had misled the appellate court. As a result of this finding, the Peel managers lost their positions on the board of TopCo and new, independent managers Michael Zini and Stefano Pileri, neither of whom had any connection to the Founders, were appointed the same day.

34. The LPAC scheduled the vote on the "no fault divorce" for July 9, 2021. Mssrs. Zini and Pileri cured the default on Group GP's payment of a capital call at the request of the AIFM. Certain credit facilities in which the Fund invested required continuity of control during the term of the investment. On July 8, 2021, the directors of Novalpina GP together with the four other shareholders of Master Luxco amended the articles of incorporation of Master Luxco, which held those investments, to require unanimity for any shareholder resolution.

In this way, they preserved the argument that the shareholder in control at the time of issuance of the credit facility retained at least a form of control and staved off a cascade of additional capital requirements, calls for repayment, and regulatory defaults.

35. The next day, July 9, 2021, limited partners including those represented on the LPAC voted the "no fault divorce." Novalpina GP would be formally replaced once the prerequisites in the Limited Partnership Agreement had been satisfied. The exact amount of the Sponsor Commitment and Removal Entitlement would be determined by a professional independent valuation firm appointed by Novalpina GP with the approval of the LPAC.

36. On the basis of a valuation of the Fund's assets conducted by Ernst & Young and the Fund's independent AIFM (LIS Sanne S.A.) (in the ordinary course and not for the no-fault divorce) the Fund's administrator Alter Domus Alternative Asset Fund Administration S.à r.l. determined that, as of July 30, 2021, the Sponsor Commitment owed to Group GP and the Carried Interest Partner would be 40,558,946 euros and the Removal Entitlement, 282,925,127 euros.

37. Per a Witness Statement by Stefan Kowski dated March 7, 2022, filed in legal proceedings in the UK, Mr. Kowski suspected that Mr. Peel would not play fair in the transition, and so he immediately instituted injunction proceedings in the UK to prevent the appointment of Peel's general partner entity.

38. Michael Langdon proposed to the LPAC that an associate of Berkeley Research Group Asset Management LLC—a US consulting firm specializing in internal disputes—serve as the new general partner of the Fund. NOAL GP—a Luxembourgish affiliate of BRG Asset Management LLC—was created on July 30, 2021 and nominated on August 6, 2021, 20 days after Novalpina GP was voted out. Per the LPA, NOAL GP could not be appointed

until the Sponsor Commitment had been acquired, which involved the independent valuation and payment. Novalpina GP proposed and agreed to extend the time period for these steps from 20 to 35 business days.

39. The LPAC and NOAL GP had no interest in following contractual protocol. Proskauer Rose in part sponsored by Stephen Peel but representing eight members of the LPAC, asked that Novalpina GP nominate a Big 4 accounting firm as independent valuer of the Fund, but then rejected those proposed, including Ernst&Young Luxembourg, Ernst&Young London and Deloitte.

40. In August 2021, Stephen Peel filed a new ex-parte application with the Luxembourg First Instance Court that had the effect of temporarily reinstating two of the Peel managers. Reinstated, in mid-August, Mssrs. Foley and Dumont and Zarb Mizzi entered into a Transition Agreement with BRG Asset Management LLC; Stefan Kowski intervened to challenge the action.

41. On 27 August 2021 (the last day of the 35 business days period), NOAL GP registered itself as new general partner of the Fund. It had not acquired the Sponsor Commitment, nor had the Removal Entitlement been paid.

42. The Sponsor Commitment and Removal Entitlement were to be determined in accordance with new "valuation principles" aimed at decoupling the obligation to pay the Sponsor Commitment from the removal of the general partner, thus allowing NOAL GP's appointment to become fully effective without paying anything to the Novalpina entities. NOAL GP excused itself from its obligations by purporting to amend the Limited Partnership Agreement—with the support of the Peel managers—to allow the Fund to

acquire the Sponsor Commitment and issue promissory notes to the Novalpina entities for whatever sum was due to them once the valuation took place.

43. NOAL GP promised to make progress on agreeing to implement the valuation principles and in particular to appoint KPMG London as independent valuer to value the Fund and then pay the Sponsor Commitment and Removal Entitlement based on the value of the Fund as of August 1, 2021.

44. The valuation never happened.  On November 9, 2021, NOAL GP stated that it was unwilling to agree to appoint any valuer because it believed that a valuation on the basis of the agreed principles would be "infeasible (and was always unworkable)."

**Legal Actions Pending in Luxembourg**

45. On December 8, 2021, the Luxembourg Court of Appeal ordered Zini and Pileri restored to their duties as managers of the Novalpina entities with retroactive effect to August 4, 2021.

46. In December 2022, Zini and Pileri obtained commercial judgments on the merits nullifying all internal decisions of the Peel managers on behalf of Novalpina GP, Group GP and the Carried Interest Partner, including to enter into the Transition Agreement with BRG Asset Management LLC, and related agreements.

47. There are three pending lawsuits on the merits in Luxembourg filed by Novalpina GP pending in the District Court of Luxembourg.  The first seeks declarations that nullify the unlawful decisions made by the Peel managers to appoint new directors to the board of Master Luxco and the subsequent decisions made by Master Luxco's board and those of certain subsidiaries while controlled by NOAL GP and the Peel managers.  The second seeks to remedy the breaches of the Limited Partnership Agreement.  As relief, Novalpina

GP seeks either to be reinstated until the conditions of the Limited Partnership Agreement have been fulfilled, or damages in satisfaction of the conditions precedent, i.e., it wants the Novalpina entities to be paid the millions of euros owed by its terms.  In a third action, to preserve the ability to collect the payment due under the LPA, the Carried Interest Partner—represented by Petitioner—also filed attachment proceedings to enjoin the distribution of Fund assets to it to first pay the Removal Entitlement, which takes priority over any other distributions.

**Contemplated Fraud Claim**

48. Civil fraud is a claim available to Petitioner under Luxembourg law and may be brought against directors for abuse of power, mismanagement, or a violation of the company's articles of incorporation.

49. The civil fraud claim will be based on acts undertaken by Langdon with malice and deceit, including by conspiring with Stephen Peel to effect the takeover while forcing a breach of the Limited Partnership Agreement, by bringing in a general partner with whom he had a prior relationship to help effectuate that breach, and by lying about the valuation of the Fund.  The claim will also allege that the Peel managers abdicated Novalpina GP's contractual rights under the LPA in order to secure lucrative board seats and management positions, which also constitutes fraud under Luxembourg law.

50. Attached hereto as Exhibit 8 is a true and correct copy of an article titled "Oregon might dump controversial spyware investment," published by AP News on December 17, 2021.

51. Petitioner will file the civil fraud claim in the Luxembourg District Court and seek restitution in the form of a clawback of undue payments to NOAL GP and the Peel managers and request the court to nullify all actions taken based on this fraud.

**Luxembourg's Evidence Law & Policy**

52. The materials sought would otherwise be unavailable in the pending lawsuit against Petitioner and in the contemplated civil fraud lawsuit due to the different rules and procedures governing discovery in that jurisdiction, and because the documents located in a foreign jurisdiction are out of reach of the Luxembourg courts who do not have extra territorial competence.

53. Luxembourgish courts do not order opposing parties to produce evidence in support of each other's claims or defenses unless that evidence can be described with specificity.

54. The materials sought, and the use of such materials in support of Petitioner's defense and civil fraud claims, do not violate any public policy of Luxembourg.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 24, 2023



Nicolas Thieltgen