# Exhibit 1

**Briefing Document filed by Mr. Thieltgen**

District Court of and in Luxembourg
XVIIth Chamber
Case No TñL-2023-04687 of the roll
Notified on 26 March 2024

## SUMMARY CONCLUSIONS
(limited to the question of the postponement)

FOR

the special limited partnership **NOVALPINA CAPITAL PARTNERS** I FP SCSp, established and having its registered office at L-1148 Luxembourg, 16, rue Jean l'Aveugle, registered with the Luxembourg Trade and Companies Register under number B217330, represented by its manager NOVALPINA CAPITAL PARTNERS I GROUP GP S.a r.l., or by any other body authorised to represent it legally,

(hereinafter the "**Defendant**");

parse défendeiesse for the purposes of a writ of bailiff Guy Engel, residing in Luxembourg, registered with the District Court of and in Luxembourg, served on 9 March 2023;

appearing by Maitre Nicolas Thieltgen, Avocat à la cour, residing at L-2535 Luxembourg, 16-18, Boulevard Emmanuel Servais, with an address for service at the chambers of Maitre Nicolas Thieltgen;

**AGAINST** :

1. Société en commandite spéciale NOAL SCSp Qxécêderninent dénommée NOVALPINA CAPITAL PARTNERS I SCSp), established and having its registered office at L-2411 Luxembourg, 15, Boulevard F.W. Raiffeisen, registered with the Luxembourg Trade and Companies Register under number B 217345, represented by its manager, Société a responsabilité limitée Treo NOAL GP S.a r.l. (previously named BRG NOAL GP S.à r.l.), established and having its registered office at L-2411 Luxembourg, 15, Boulevard F.W. Raiffeisen, registered in the Luxembourg Trade and Companies Register under number B258060, represented by its Management Board currently in office, or by any other body authorised to represent it legally;

    (hereinafter the "**Fund**");

2. the limited liability company **Treo** NOAL GP S.à 1.1. {previously named BRG NOAL GP S.à r.l.), established and having its registered office at L-2411 Luxembourg, 15, Boulevard F.W. Raiffeisen, registered in the Luxembourg Trade and Companies Register under number B 258060, represented by its Management Board currently in office, or by any other body legally authorised to represent it;

    (hereinafter "Theo **NOAL**" and together with the Fund the "Claimants");

the latter parties under the terms of the aforementioned summons issued by the bailiff Guy Engel;

with an address for service at MOLITOR Avocats à la Cour, a limited liability company established and having its registered office at L-2763 Luxembourg, 8, rue Sainte-Zithe, registered on list V of the Luxembourg Bar, registered with the Registre de Commerce et des Sociétés de Luxembourg under number B211810, which is constituted and occupies for the Plaintiffs and which is represented for the purposes of the present proceedings by Mr Paulo Lopes Da Silva, Avocat à la cour, residing professionally at the same address.

---

Reviewed the assignment of 9 rriars 2023

Reviewed the timetable of 11 October 2023 limiting the present conclusions solely to the question of the stay of proceedings

Reviewed the submissions of MOLITOR Avocats to the Court of 2 November 2023 Reviewed the submissions of Maitre Nicolas Thieltgen of 28 November 2023 Reviewed the submissions of MOLITOR Avocats to the Court of 29 December 2023

---

By way of introduction, it should be noted that the present conclusions are limited to a request for a stay of proceedings pending a decision in the case pending under numbers DAL-2022-03617 and TAL-2022-07672 of the Court.

## 1. Facts and figures

### 1.1. The local context

By official letter dated 26 September 2023, the Defendant, through its counsel, requested Your Tribunal to stay the proceedings until a decision in the case pending under numbers TAL-2022-03617 and TAL-2022-07672 of the roll and, if not, in the referral case which, following an appeal in cassation lodged by the plaintiff, is currently pending before the Court of Cassation under number CAS-2024-00015 of the roll.

By letter of reply dated 9 October 2025, the Applicants objected to this request.

Under the terms of a schedule dated 11 October 2023, the Court invited the parties to reach a conclusion on the question of whether to stay the proceedings.

In these written submissions, the Defendant therefore intends to take a position on this issue, as well as on the arguments presented by the Claimants in their submissions notified on 2 November 2023 and 29 December 2023.

First of all, it is necessary to go back over the seizure operations which are at the heart of this procedure.

As set out by Maitre Lopes Da Silva in his letter of 9 October 2023, the Defendant in the present case is criticised for having obtained an authorisation for garnishment (arising from an order made by Mr Frédéric Mersch, Vice President of the District Court of and in Luxembourg, replacing the President, on 22 September 2022) using unfair methods and for having abused its potential right to enforce that garnishment.

Subsequent to this seizure, the Fund brought an application for interim relief seeking the reversal of the presidential order of 22 September 2022 on the basis of which the seizure of 27 September 2022 was carried out and the release of the seizure. By order of 4 November 2022, the interim relief judge ordered the revocation of the aforementioned order of 22 September 2022 and the release of the seizure.

The Defendant appealed against the order of 4 November 2022 and, on 15 November 2023, the Luxembourg Court of Appeal confirmed the order.

On 18 January 2024, the Defendants lodged an appeal in cassation against this decision. Although the Claimants argued in their pleadings that the Court of Appeal had upheld the contested order, arguing in particular that the report drawn up by ERNST & YOUNG Luxembourg, which had served as the basis for the attachment, could not be considered to be a "*neutral assessment*" of the Fund's assets, it should be noted that it is precisely this point that is the subject of criticism before the Court of Cassation.[1]

It is particularly relevant to point out that at no time during the proceedings did the Claimant raise any argument suggesting that the cettÎtude of the claim in question would be subject to the establishment of a *"neutral"* valuation.

It should also be noted that the Defendants, being certain of the accuracy of this assessment, together with other companies in the Novalpina group, submitted the criticisms made by the Fund and its manager to an independent and neutral expert, Xinex Conseil (hereinafter the "**Xinex Report"**), which confirmed that these criticisms were unfounded*.

However, the Court of Appeal refused to take the Xinex Report into consideration, taking the view that it was an item produced in the course of the proceedings and not at the time of the application for authorisation to garnish. Consequently, it is currently argued by the Defendants before the Court of Cassation that by disregarding the Xinex Report on such a ground, the Court of Appeal in fact deprived the Defendants of their right to a fair trial, guaranteed by Article 6 § 1 of the ECHR.

As a result, the forthcoming Court of Cassation ruling will undoubtedly have a considerable impact.

---

Exhibit n. IG - Mémoire en cassation dated 18 January 2024.
 Exhibit n. 11 - Laplume expert report dated 12 April 2023.

- 4 -

1.2. <u>The factual context</u>

It should be remembered that the attachment of 27 September 2022 was carried out as a protective measure in the context of the case brought by the notice with writ of execution served by the Defendant on 3 October 2022.

This case has not been brought in a hostile manner, as the Claimants suggest. On the contrary, the Defendant is claiming, among other things, only what is owed to it, i.e. payment of its claim *(i.e.* the *RezvovglF ntillemeei),* justifying the attachment (numbers TAL 2022-03617 and TAL-2022-07672 of the Roll).

1.2.1. *La créance justifiant la saisie-arrêt, le « Removal Entitlement »*

For a better understanding, it is worth briefly explaining the following about the *Removal Entitlement :*

- The Fund's social contract is called Lirnited Partnership Agieernent I ("LPA"). It has been concluded and signed by, on the one hand, Novalpina Capital Paxtners I GP and, on the other hand, Novalpina Capital Paxtners I GP.
S.a i.1. ("**Novalpina GP**", or the "**Revoked Manager**"), Novalpina Capital Partnezs I Group GP S.a i.l. and Novalpina Capital Partneis I FP SCSp (the Defendant) and, on the other hand, all the other investors in the Fund (also referred to as "**Limited Parmers**").

- In particular, the LPA sets out the rights and remedies where Novalpina GP, as manager of the Fund, is wrongfully dismissed. The LPA stipulates that in such circumstances, various entities of the Novalpina group (including the Defendant) are the beneficiaries of several payments from the Rrcore/Liffff/rmrs/ and the *5ponsor Commitmeni.*

  The Fund has always confirmed the right to these payments.

- The value of the *Sponsor C0mmitmeut* is calculated on the basis of a valuation to be carried out by an independent expert who must be appointed by the revoked Manager and approved by the Fund's Investor Advisory Committee (hereinafter the "LPAC").

- The Rrzvo ri/ *humbly,* like the *Sponsor Commitment,* is to be determined by an independent valuer and represents the share of the profit that the *Carried Interest Partner (*i.e. the Defendant) would have received if all the investments had been sold at their value (hereinafter the "**Fair Value**") on the day the investors elected to revoke Novalpina GP, i.e. 9 July 2021. The Rrzrnrn/de/t//ewerf is payable by the L-onds as a pñority payment, i.e. it must be paid before any Limited Partner or the new manager receives any distribution from the Fund.

---

^ Exhibit n. lThird Amended and Restated Partnership Agreement.
* Exhibitri.1 ThirdAmended and Restated Partnership Agreement. See articles 20.3.1, 20.3.3 and 20.3.5.

- All the Fund's investors were fully informed. By way of example, a member of the LPAC (the Fund's investors' committee) representing Centrica Combined Common Investment Fund Limited (the company summoned in the case pending under the numbers TEL-2022-03617 and TAL-2022-07672) recalled the exact terms of the LPA, **2 days before the revocation of** Novalpina GP, in an email sent to Michael Langdon (chairman of the LPAC)

    "The General Partner shall as soon as reasonably practicable appoint an independent valuer whom it considers in good faith to have the iequĪse expertise in valuing assets of a type corriparable to the investments in question, provided that such appointment has been approved by the LPAC. The Independent Valuer will be appointed to determine the value of the in-vestments and the General Partner will use its reasonable endeavours to: (i) ensure that such valuation is providedĪe within 30 working days of the appointment of the Independent Valuer; and (ü) provide the Independent Valuer with such information and access to the in-vestments as it may iaisorinably require to produĪre its valuatĪon. The Independent Valuer's decision will be final and binding and will constitute the value at which the Investments will be treated for the purposes of this clause 20.3.3. The fees and expenses of the independent expett shall be borne by the Partnership.".

- However, the LPAC and the Deinandeiesses Parties have always opposed the appointment of an independent expert. To date, despite the numerous proposals made by the dismissed Manager (as provided for in articles 20.3.3 and 20.3.5 of the LPA) to appoint a "*bigfour*" as independent valuer in accordance with the wishes expressed by LPAC through its English counsel Pxoskauer, neither the new Fund Manager (Treo NOAL) nor LPAC have agreed to this, without times rii reason,
    to appoint an independent valuer to determine the value of the Fund's assets and thus enable the value of both the *Jircom/ full//men/* and the *Sponsor Commitment to be* determined on 9 ]ui1let 2021.

- Having prevented the appointment of an independent expert, they now maintain that a valuation of the Fund's assets by such an independent expert is no longer feasible. Ice *Removal Entitlezrent* would therefore no longer be determinable, and it would no longer be payable.

    Their aim is to take advantage of their own turpitude.

---

rice no. 12 - Email sent to hĦlchael Langdon dated 6 July 2021 (traductioi fibre).
 "Independent valuer nominations for Advisory Committee con*ideraÙon / approval (we would expect this to be a norriination with significant market reputation, for example a 'big four' accounÛng firm)".Exhibit n.13 - (it being specified that Clifford Chance was then legal counsel to Novalpina GP).

- Feu as a result of the actions taken by LPAC and the Latter Parties, more than two years after Novalpina GP's dismissal without cause as manager of the Fund and despite the clear and precise terms of the LPA[7] , on the pretext that there was no valuation:

    ➢ The *Sp "i r C "mmilment* was not acquired by the new manager of the Fund (the Claimant - Treo NOAL), although this was a condition precedent to his taking up his duties;

    ➢ Rreore/Mali//swsx/ has not been paid.

It is against this background that the various manoeuvres orchestrated by the Fund, LPAC and Theo NOAL to circumvent at all costs the appointment of an independent assessor, thereby legitimising the implementation of the garnishee procedure, will be set out below.

*1.2.2. Les manœuvres orchestrées par le Fonds, le LPAC et Treo NOAL pour contourner à tout prix la nomination d'un évaluateur indépendant, légitimant la mise en place de la saisie-arrêt*

1.2.2.1. The unjustified rejection of ERNST & YOUNG Luxembourg's valuation report

Your attention is drawn to the fact that, following the Manager's request of 23 July 2021 to have *Commitmegl* bought out, and LPAC's request to appoint an independent valuer, Novalpina GP has proposed to LPAC that ERNST & YOUNG Luxembourg should be the independent valuer.

For Novalpina GP, this choice was all the more judicious given that the independent fund manager (also known as AIFM and regulated by the CSS) must carry out a valuation of the net value of the Fund every quarter (each investor is thus informed of the net value of each unit they hold) and that, on the recommendation of the independent fund manager, Same LIS S.A., ERNST & YOUNG Luxembourg had been appointed as independent valuer and had carried out a valuation of the Fund's assets for the second quarter of 2021.

This valuation, carried out by ERNST & YOUNG Luxembourg, was then reviewed, analysed and approved by Same LII S.A.' as the only official Fair Value at 30 June 2021.

---

The value of the JQoniar CPwwifmssf is calculated on the basis of a valuation to be carried out by an independent expert who must be appointed by the revoked Manager and approved by the board of investors of the LPAC Fund.)

Exhibit 21 - E-mail sent by Mr. Zini to LPAC members.

Exhibit 2 - EY valuation as at 30 June 2021 and quarterly valuation of the Fund's net assets as at 30 June 2021 determined by the Fund's independent manager (or AIFM) LIS Sanne S.A..

In addition, LPAC was fully aware that ERNST & YOUNG Luxembourg was carrying out the valuation in question. Thus, there was no hidden agenda or motive.

Indeed, it is clear from various exchanges with LPAC that the latter was aware that ERNST & YOUNG Luxembourg was working on the second quarter valuation.

- Moreover, the engagement letter signed by ERNST & YOUNG Luxembourg (and which therefore includes the details of the mandate) was transmitted, in full transparency, to LPAC".
- However, LPAC did not raise any objections to this mandate, nor did it question the seriousness of ERNST & YOUNG Luxembourg, until the evaluation was completed.
- It is sufficient to note that LPAC was considering appointing ERNST & YOUNG London to assess the *5ponsor Commitmeut* and the *&zrnrn/ humbly* to demonstrate the legitimacy and seriousness of ERNST & YOUNG Luxembourg.

This clearly demonstrates that there was no alleged hidden manoeuvre aimed at obtaining the evaluation of ERNST & YOUNG Luxembourg. In fact, LPAC was fully aware of the entire valuation process and did not express any concerns in this regard.

Given that no major events occurred between 30 June 2021 (the date of the quarterly valuation) and 9 July 202J (the date of the dismissal of the dismissed Manager and the x-valuation of the Fund's assets to define the value of the *Xponsor Coirmitment* and the *Removal Enütlemec),* all parties agreed to have the valuation updated (at a date 9 d a y s later) by this same entity, whose reputation and independence as a fi/g *Four* is beyond doubt.

However, several emails and other documents" highlight the bad faith of the Fund, LPAC and Theo NOEL in resisting payment of the *Sponsor Commitment and* the Rieure/ *Fntitlement* and attempting to reject the valuation carried out by ERNsT & YOUNG Luxembourg.

- On 2 July 2021, the Chairman of LPAC invited all LPAC representatives to meetings with two potential candidates for the position of new Fund Manager, one being Alix Paitnexs", and the other being Treo NOAL's parent company, Treo Asset Management LLC, formerly known as BRG Asset Management LLC). The purpose of these meetings was to evaluate the two candidates to determine which best met the LPAC criteria.

---

Exhibit 20 Letter of engagement from Ernst & Young Luxembourg.

" Following injunctions issued by the Federal District Court for the District of Oregon against the State of Oregon (Discovery Proceedings), Novalpina GP has recently begun obtaining copies of previously unknown email exchanges between Very NOAL and LPAC. The production of these documents is still in progress, but certain copies of the emails obtained so far already demonstrate the true intentions of the Defendants.

[12] Exhibit 22 - E-mails of 2 July 2021.

The agendas for both meetings included a requirement for the new Fund Manager to acquire the *Cuww/fwrnf Sponsor,* and made explicit reference to the question of whether this requirement could be resisted in any way.

With regard to *Nickname/Kntitlement*, both agendas stated:

"How can your company help guide the assessment process that will define the revoked GP's rights?" ',[1]

sfiide

" Perhaps we could reduce assessment]'" LPAC then

asked the following question:

"Should the Fund carry out an audit/investigation of the manager dismissed for breach of fiduciary duty? If any claims are found to have been made, what steps, if any, should the company take to recover the Remox-a1 Entitlement?"".

It is clear that LPAC had no intention of complying with the provisions of the LPA and was looking for a new fund manager willing to breach the contract and the law, and kill a witch hunt to implement LPAC's wishes not to pay the *Sponsor Commitment* and *Removal Fntitlement.*

- In addition, in an email dated 2 August 202J", Benoit Roberts, who is the Compagnie Nationale a Portefeuille representative on LPAC, discussed the appointment of an independent expert with Proskauer (counsel to 8 Limited Partners represented on LPAC) and Treo NOAL, and admitted that "we d o n 't have many options (and it's not as if EY and Deloitte aren't reputable firms)".

  However, as soon as ERNST & YOUNG Luxembourg delivered its assessment of the value of the Fund's assets for the second quarter of 2021, LPAC suddenly rejected Novalpina GP's proposals to appoint ERNST & YOUNG londres."

---

^ Free translation. Original text : "What help if any can your firm offer guiding the valuatîon process that will crystalize the rernoved GP's cairy entiilement ?".
^ Free translation. Original text: "Given where the debt on thèse coinpanies es trading, we rnight like to push back on the marks".
Free translation. Original text : "Should the fund audit/lnvestigate the removed GP for bfeaches of fiduciary duty? \Vere any to be found, what recover) (if any) of removal entitlernents could be pursued by the partnezship?".
Exhibit 17 - Email from Mr Roberts dated 2 August 2021.
"In addition, PWC cannot be appointed as it is also an auditor of the Fonéls, which poses a conflict of interest problem.

An exchange of e-mails on the same day between Michael Langdon, Finbarr O'Connor, Jeffrey Dunn and Gavin Farell of Theo NOAL proves that it took Theo NOAL (formerly BRG NOAL GP S.a x.1.) only 6 minutes (!) after receiving the valuation to conclude :

"This excludes the possibility of E&Y being the independent valuer." "

The fact that the valuation does not suit the Fund and LPAC cannot disqualify the work of ERNST & YOUNG Luxembourg which, like any *Big ⁰ottr,* necessarily acted independently (as the Fund and Treo NOAL have acknowledged).

Moreover, the Chairman of LPAC himself admitted that he knew of no legitimate reason not to accept this assessment, stressing nevertheless that he was prepared to do whatever was necessary to prevent the payment of the Rendre/ L ////excel and the *Sponsor Commitmeut* on this basis:

"I don't know what we would need to document why we don't accept this assessment, **but I will do whatever is necessary."**

- Emails dated 19 August 202J go so far as to reveal the intense efforts made internally to conceal the valuation carried out by ERNST & YOUNG Luxembourg and approved by the AIFM, Same LIS S.A. Thus, Mr Michael Langdon, Chairman of LPAC, referring to the said valuation stated that
"under no circumstances should we record this quarterly valuation".² °

1.2.2.2. Categorical refusal to appoint another appraiser

Following the purported appointment of Treo NOAL as the new fund manager, Theo NOAL and LPAC then considered appointing KPMG Louches as the independent valuer. Thus, in an email dated 22 September 202 J", Treo NOAL recommended to LPAC the appointment of KPMG Louches, confirming that there was no doubt as to its independence :

"As far as KPMG is concerned, we believe that it is unlikely that any of the "big four" valuation firms would perform this task in an independent manner, our independence due diligence has been satisfied at all times by KPMG, and KPMG has a two-partner team, which allows us to pay ourselves more against any risk of undue influence.

---

[8] Exhibit 16 Exchange of e-mails dated 19 August 2021 (Please note that the time difference between Portland, Oregon and New York is 3 hours. The e-mail from Mr Michael Langdon received by Treo NOAL at 5.00 p.m. New York time was therefore sent at 2.06 p.m. Portland time, and the reply to this e-mail sent by Treo NOAL at 2.12 p.m. Portland time is therefore only 6 minutes later).
Exhibit 14 - Email exchanges of 29 September 2021 and 19 August 2021.
2° Exhibit n. 14 - Email exchanges of 29 September 2021 and 19 August 2G21.
Exhibit 15 - Email from Mr Jeffrey Dunn dated 22 September 2021.

This same reasoning applies J§io *facto* to ERNST & YOUNG Luxembourg which is also a *Big baer*.

The above-mentioned e-mail goes so far as to consider confirming ERNST & YOUNG Luxembourg's assessment, stating that :

> "if (in its valuation) KPMG proposed an unreasonable figure, BRG and LPAC would be more likely to challenge such a valuation than to reject the valuation of a valuer they had suggested"'[2] .

This attitude unquestionably demonstrates Treo NOAL's total lack of good faith and its desire to avoid by all means making the payments provided for in the LPI.

There is no need to look far to find the reasons for this bad faith: the amount paid to the Defendant ParSe has a direct impact on the amount received by Treo NOAL.

This is clear from an email between LPAC members, dated 10 July 2021[2] ', discussing the financial terms of the appointment of Treo NOAL as the Fund's new *General Partner*.

Antoun Ghanerri, of ñIDC CAPITAL PARTNERS (parties summoned in the case pending under numbers TAL-2022-03617 and TAL 2022 07672 of the roll), then requested:

> "Is their commission *[that of Tres* NOEL} calculated on the net amount distributed to the *M'zvited* Parfurrr, i.e. after deduction of the right to the *t'a ed interest* linked to the revocation of the *General Partner î"* [i.e. the *Remaval*

to which I\Michael Langdon, President of LPAC and representative of the State of Oregon, parties also summoned in the case pending under numbers TAL-2022-03617 and TAL-2022 07672 of the roll, replied":

> "Yes*,* the corrimission will correspond to the final net amount of the distribution sent to us, so the 2.5% will apply after the *carried interest* entitlement *arising from* the revocation of the previous *General P irtcer.*
>
> Clearly, this is another incentive for BRG to try to manage this evaluation exercise carefully.

It is shocking to note that the LPAC has put in place explicit financial incentives for Treo NOAL to *"manage the valuation exercise"* whereas the LPA clearly stipulates that an independent valuer must carry out the valuation of the "*5penser* N "ww//wsuf" and the "5penser N "ww//wsuf".
"*Rrwnrn/ p "fzf/cwrn/"*, with the *General Partner* undertaking to provide it with all the information it needs to carry out this assessment independently.

---

\*\* Exhibit n. 15 - Email from Il. Jeffrey Dunn dated 22 September 2021 (Translation libxe).
2^ l°ièce n. 18- Email between LPAC members, dated 10 July 2021 (Free translation).
[24] Exhibit 18- Email between members of LP.4C, dated 10 July 2021 (Free translation).

It is probably for all these reasons that, after signing an engagement letter with KPMG, Treo NOAL suddenly refused to engage I€PMG. To date, and without any valid reason on the part of LPAC or Treo NOAL, it has not been possible to appoint an independent valuer. Now, alleging the absence of an appraisal, the Fund is refusing to pay any amount whatsoever to the Defendant.

It follows from the foregoing that despite the good faith and involvement of Novalpina GP, LPAC systematically abused its right of veto to refuse, without legitimate reason, all the independent appraisers proposed by Novalpina GP, with the result that by 27 August 2021 no independent appraiser had been appointed.

Using (and abusing) this lack of norninadon from an independent é-a1uatem, the Fund, under the management of Treo NOAL, corrimencê to dispose of (and lose) assets and distribute the resulting financial consideration to investors, in total breach of the LPA and the priority distribution due to Novalpina Capital Paitnexs I FP sCSp under the Rrourn/ *Entitltmt t*.

The Claimant therefore had no choice but to seize the assets in order to prevent the Fund from distributing the funds due to it. In the absence of any challenge to the ERNST & YOUNG Luxembourg report by another independent appraiser, and in view of the foregoing, reference should be made to the latter, which enables the amount of No alpina Capital Paxtnets I EP SCSp's claim to be established without any doubt.

This valuation was also used by the front men of the 1st Landing Parties[2]', Messrs Foley and Dumont, who passed it on to the six investors.

Finally, it should be noted that no action has been taken by the Litigants against Same LIS S.A., ERNST & YOUNG Luxembourg or Messrs Dumont and Foley. On the contrary, Same LIS S.A. was reappointed, as were Messrs Dumont and Foley.

It was therefore on the basis of this assessment of the value of the Fund's assets that the seizure was carried out, as the Claimants had never, at the time of the seizure (nor even at the time of these proceedings), submitted a new, contradictory assessment - they argue, moreover, that an assessment would no longer be feasible today.

---

[2]* By virtue of an order made on unilateral application, Messrs Dumont and Foley had been temporarily reinstated as managers of Novalpina GP (Exhibit ri 5 - Order made on unilateral application on 4 August 2021) - this order was re-enacted with retrospective effect (Exhibit n. G - Judgment dated 8 December 2G21).
Mr Dumont and Mr Foley are currently managers of a number of companies controlled by the Claimants (Exhibit 7 - LBR extracts of the said companies). fls therefore have the full confidence of the Claimants.
*Exhibit 8 - Quarterly report on the Fund's valuation as at 19 August 2021.

The argument that financial institutions and investors were "experiencing *serious concerns about the situation and the future of Woods*" is therefore untenable. If the financial institutions and investors are concerned, we should rather question the management of the Fund, which for years has been trying in every way possible to avoid having to pay the *Spo "sor Commitment* and the *Rrzvnrn/ Hntitlement*.

2. **In law**: **on the application for a stay of proceedings**

A very recent body of case law has explicitly set out the principles governing the stay of proceedings:

> "A stay of proceedings is an internal measure imposed by law or decided by the court with a view to improving the administration of justice. In the absence of a legal obligation, the question of whether or not to grant a stay of proceedings is a matter for the sole sovereign appreciation of the judges.
>
> Thus, concern for the proper administration of justice may be sufficient to recommend a stay of proceedings pending a decision in another dispute. This is a stay of proceedings not provided for in the legislation and is based on the judge's power to ensure that the proceedings run smoothly in accordance with article 52 of the New Code of Civil Procedure (cf. TAL, 30 June 2021, no. TAL-2020-08393).
>
> It is accepted that a court may always stay proceedings in the interests of the proper administration of justice, if it considers that a subsequent event may have an impact on the resolution of the dispute.
>
> Generally, the stay of proceedings is granted in consideration of the proper administration of justice, in particular where a decision to be handed down in the context of another pending proceeding is of such a nature as to influence the outcome of the dispute. The judge hearing the dispute may suspend the proceedings pending the decision (cf. Court of Appeal, 26 June 2019, no. CAL-2015- 00445 du róle).
>
> This is a discretionary power, the duration and conditions of which the courts themselves determine on a case-by-case basis. Jurispiudence itself sets itself the line that a stay of proceedings may only be ordered in the interests of the proper administration of justice or the proper conduct of the proceedings (cf. Cour d'appel1 , 16 June 1999, ri° 19656 du tóle). A stay of proceedings, the purpose of which is necessarily to extend the duration of the proceedings, must only be ordered in situations that are clearly justified and can be substantiated on the basis of concrete evidence (cf. T. HOSCHEIT, Le Droit judiciaire au Grand-Duché de Luxembourg, Ed. Bauler, ri° 973) "[27] .

---

[27] TAL, commercial judgment no. 2023TALCH15/00238 of 8 February 2023, roll no. TEL-2022 001024.

It should be remembered that in the present case, the Defending Party is facing allegations that it obtained an authorisation for attachment unfairly and abused its potential right to enforce the attachment.

Although the summary proceedings were not mentioned in the first pleadings submitted by the Defendant, it is important to note that these pleadings date from shortly after the notification of the judgment of 15 November 2023 of the Luxembourg Court of Appeal.

At that time, the Respondent was still in the process of analysing the judgment in question and considering whether to lodge an appeal in cassation. It was only after an in-depth study of this judgment that a number of serious shortcomings were identified, as explained above, which prompted the Defendant to lodge an appeal in cassation.

However, it is particularly surprising to note, on reading the submissions notified by the Plaintiffs on 2 November 2023 and 29 December 2023, that the summary proceedings do not justify a stay of proceedings in the present case.

The Defendants having put forward similar arguments before the Court of Appeal regarding alleged unfair conduct at the time of the application for authorisation to seize the property, this issue can now only be addressed once the Court of Cassation has intervened.

Indeed, if the Cour de Cassation were to overturn the judgment in question, this would reinforce the idea that the initial seizure had not been carried out in an abusive manner and would testify to the legality of the seizure, despite the allegations of unfair conduct. It would therefore be difficult to imagine how the seizure in question could have been implemented in an abusive manner.

Furthermore, it is essential to underline that the case on the merits initiated by the Defendant on 3 October 2022 and related to the validity of the payment of the claim (pending under the numbers 'rua-2022-03617 and TAL-2022-07672 of the register), which serves as a basis for the garnishment, is closely related to the present case. If the claim proves to be legitimate at the end of this procedure, this would strengthen the justification for garnishment as a protective measure and dispel allegations of abuse.

The Defendant would thus have acted within its legitimate rights to secure the recovery of its claim, rather than acting abusively.

Consequently, in view of the foregoing and given that this case is closely linked to the confirmation of the claim which will take place in the context of the case pending under numbers TAL-2022-03G17 and TAL-2022-07672 of the Zóle, it is necessary, in the interests of good judicial administration and the proper conduct of the proceedings, to stay the proceedings pending a final decision in this related case.

---

[28] Pièce ri.19 - klolitor's pleadings of 25 September 2023 for the hearing of 3 October 2023.

In the alternative, the Defendants formally object to any reconciliation of Róles n°TAL-2022-03617 and TAL-2022-07672 with the present Róle. Such a request by the Claimants has only one purpose, which is to further delay the proceedings on the merits relating precisely to the validity of the payment of the credit. In fact, in these islands, the Claimants, together with the other parties summoned, are constantly resorting to purely dilatory rnanœuvres.

In this way, the opposing parties have up to 15 months in which to conclude and only conclude when they are obliged to do so. It should also be noted that in these cases, the court has decided to limit the proceedings to questions of admissibility for the time being, which, given the attitude of the parties summoned, does not fail to prolong the whole procedure excessively.

If the cases were joined, there would be a further risk of prolonging the proceedings and making them even more complex. The Claimants themselves confirm the complexity of these cases.

Lastly, it is surprising to note that the Latter Parties, suggesting the possibility of a judgment, if they really considered that the garnishment had been exercised in an abusive manner, did not for the rest formulate any reconventİorinual claim in their submissions for damages.

If the Claimants were acting in good faith, the question arises as to why such a request has still not been made. Moreover, they have decided to initiate a completely new procedure and to persist in doing so.

This lack of a claim further indicates that the present proceedings appear to have been initiated primarily for the purpose of delay, rather than for the purpose of genuine redress.

## FOR THESE REASONS

and all others to be deducted when pleading and to be substituted, even ex officio, and subject to the express and foxrriel1e reserve of being able to change, increase or modify the present conditions during the course of the proceedings, as appropriate, Maitre Nicolas Thieltgen, for his part, claims that he should

## MAY IT PLEASE THE COURT

declare that it is necessary to stay proceedings pending a decision of the Court of Cassation in the case pending under number CAS-2024-00015 of the Island ;

or else,

declare that it is necessary to stay the proceedings pending a decision of the Tribunal d'nroridissement de et a Luxembourg in the case pending under numbers TAL-2022-03617 and TAL-2022-07672;

give notice to the Plaintiff that it reserves all other rights, means and actions.

A copy of the foregoing submissions, without prejudice, was sent by e-mail to MOLITOR Avocats à la Cour.

Luxernbourg, 26 March 2024.

Pour original,

Nicolas Fhieltgen

Copy received on
MOLITOR A locats à la Cour
s. Paulo Da Silva